IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL LEIT,

               Plaintiff,

    v.

ASPIRUS MEDICAL GROUP, INC.,
d/b/a ASPIRUS CLINICS, INC.,

               Defendant.

OPINION and ORDER

22-cv-79-slc

---

In this civil diversity action brought under Wisconsin state law, plaintiff Michael Leit, an orthopedic surgeon who now is disabled, claims that his former employer, defendant Aspirus Medical Group, Inc., breached his employment agreement and the implied covenant of good faith and fair dealing when it terminated him in May 2021 pursuant to the agreement's disability provision.[1] Now before the court are the parties' cross motions for summary judgment. Leit seeks partial summary judgment on Aspirus's liability for breach of the express terms of the contract and the amount of damages resulting from the loss of his base salary. Dkt. 22. Aspirus moves for summary judgment on the breach of contract and implied covenant claims, arguing that its termination of Leit complied with the disability clause of his employment agreement. Dkt. 27. The parties' motions essentially mirror each other, pointing to the same facts but arguing for opposite results.

For the reasons set forth below, I am denying Leit's motion for partial summary judgment and I am granting Aspirus's motion for summary judgment.

The following facts are undisputed except where noted:

---

[1] Leit also alleged breach of contract claims based on Aspirus's long-term disability insurance policy and promissory estoppel, dkt. 1, but he voluntarily dismissed those claims on April 26, 2022. *See* dkt. 11.

UNDISPUTED FACTS

**I.  The Parties and Background**

Plaintiff Dr. Michael Leit is a citizen of New York.  From 2008 to 2019, he worked as an orthopedic surgeon at Rochester Medical Group, where he helped grow the orthopedics group.  In 2009, Leit was diagnosed with sarcoidosis, an autoimmune condition that causes lung damage.  Leit underwent valve repair surgery for severe aortic regurgitation in 2019.  In October 2019, Leit went to work for defendant Aspirus Medical Group, Inc., a corporation with its principal office in Wausau, Wisconsin.  Aspirus was aware of Leit's pre-existing medical conditions when it hired him.

**II.  Aspirus Hires Leit**

After a colleague left Rochester to work for Aspirus in 2016, Leit began discussing possible employment at Aspirus.  Following several communications with Leit in 2018 and 2019, Aspirus presented Leit with a letter of intent dated April 12, 2019.  The letter of intent indicated that the position was eligible for retirement, health insurance, dental insurance, vision insurance, disability insurance, and continuing medical education benefits.  Attached to the letter of intent was a document titled "ACI Benefit Information Physician – Michael, Leit, MD, MS," which listed the benefits available to Leit, including a long-term disability insurance (LTDI) policy and five types of "time off."  One type of leave was Aspirus's self-funded, self-administered short-term disability (STD) benefit that Aspirus maintained for its employees.  *See* Plan doc., dkt. 29-7.[2]

---

[2] Although Aspirus refers to a STD "policy," Leit contends that the benefit is a "plan" and that no "policy" exists.

2

The benefit information attachment stated that Aspirus's contributions were provided "pursuant to current policy." Dkt. 29-2 at 4. It also stated that benefit information may be updated periodically, and that Aspirus reserved the right to change or revise benefits offered at any time. Although Leit reviewed comprehensive brochures on Aspirus's short-term and long-term disability benefits, he did not request a copy of the actual policy or plan documents before signing the letter of intent on April 17, 2019.

On May 29, 2019, Leit and Aspirus executed an employment agreement under which Leit would provide orthopedic surgery services to patients at Aspirus Langlade Hospital in Antigo, Wisconsin and services as the Regional Program Development Medical Director. The agreement stated that Leit's employment would begin on October 1, 2019 and continue for an initial term until September 30, 2022, after which the contract would automatically renew for consecutive one-year terms. *See* dkt. 26-1, at §1.2. Leit's duties as a physician included seeing patients in the office from 9 a.m. to 4 p.m. (about 5,000 visits a year), charting for several additional hours a day, and taking 15-20 emergency room calls a month. Leit has described the practice of orthopedics as physically demanding and equated it to a "full-contact sport." Leit depo, dkt. 26-3, at 70:12-20.[3]

Leit began working for Aspirus on Monday, October 14, 2019.

---

[3] Orthopedic surgeons service the musculoskeletal system including the "spine, diseases involving bone, injuries involving bone, muscle, nerve injuries, ligament and tendon injuries to the upper and lower extremities and injuries to the spine." *Id.* at 10:2-7.

### III.  Employment Agreement Provisions

Leit's employment agreement (*see* dkt. 26-1) contains all of the terms and conditions related to his employment and it was the entire agreement and understanding between the parties with regard to the matters addressed within it.

Relevant to the summary judgment motions, Section 6.1 states that the agreement shall terminate if certain events occur, including:

> 6.1.1   Upon the expiration of the Initial Term, by either party without cause at any time upon prior written notice to the other party at least one hundred eighty (180) days prior to the termination. Termination shall be effective at the end of the one hundred eighty (180) day notice period.
>
> * * *
>
> 6.1.3   Upon the Physician's death or the determination of being "disabled." Disabled, and the procedures for being determined disabled, shall be defined in the disability insurance policy provided by Aspirus hereunder.

*Id.* at 14.

Aspirus drafted Section 6.1 of the employment contract in its entirety without any input from Leit.

### IV.  Leit's Disability Leave and Benefits

In the spring of 2020, Leit began feeling unwell and was having difficulty breathing.  On August 26, 2020, about ten months after his first day of work for Aspirus, Leit reported to his primary care physician that he was suffering from chronic cough, shortness of breath, and intermittent chest pain.  Due to Leit's known preexisting conditions, Leit's doctor instructed him

to stop work immediately and go back to New York until his health would allow him to return to work.

On August 27, 2020, Leit completed a "Leave of Absence Request Form" and an "Attending Provider Statement Short Term Disability Request Form," which included his physician's representations about Leit's disability and which stated that he would need leave until September 28, 2020.

## A. Initial STD benefits

Aspirus's STD plan document states that to be eligible for payment of short-term disability benefits, an employee must meet the definition of disability. *See* Plan §6.k, dkt. 29-7, at 13. Under § 6.a of the plan, a "[p]erson is considered 'disabled' when the Plan Administrator[4] determines that they cannot perform any of the essential functions of their occupation as before the disability due to non-work related illness or injury and are unable to be accommodated at another job within the company." Dkt. 29-7, at 10. Based on the information provided by Leit and his medical provider, Leit was determined disabled and eligible for STD benefits beginning on August 27, 2020.

## B. Private LTD Policies

At the same time Leit sought STD benefits from Aspirus, he also applied for benefits from his own privately-purchased long-term disability policies through Northwestern Mutual and Principal. Northwestern determined Leit to be totally disabled[5] under its policy, and Leit started

---

[4] The plan administrator is identified as Leave Management Services.

[5] Defined as "unable to perform the principal duties of the regular occupation" during an initial period, and then "unable to perform the principal duties of the regular occupation and not gainfully employed in any occupation." Dkt. 30-8 at § 1.4.

receiving the full benefit amount ($3,000 a month) from Northwestern on August 27, 2020. Principal also determined Leit to be totally disabled[6] under its policy documents as of August 27, 2020, and Leit started receiving $10,000 in monthly benefits from Principal on November 25, 2020; that amount increased to $10,300 on August 27, 2021.

### C.  Continued STD Benefits

On September 23, October 28, and December 30, 2020, and January 4 and February 17, 2021, Leit completed the paperwork necessary to extend his STD leave, asserting through his physician that he could not return to work with restrictions and was completely incapacitated. On December 31, 2020, Leit corresponded with Aspirus's leave management team, informing them that he was feeling "a little worse" and that his primary care provider was extending his leave to February 23, 2021.  In February 2021, Leit completed an affidavit for Aspirus stating that he had not worked for any employer in any capacity since August 27, 2020, and that he had been and remained medically disabled and incapable of working in any capacity since his leave began on August 27, 2020.

### D.  Aspirus's LTDI Policy

Aspirus's LTDI policy defines the terms "disability" and "disabled" as "partial disability" or "total disability."  Dkt. 26-2, at p. 18.  Total disability is defined as:

> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.

---

[6] Defined as not working and "unable to perform the substantial and material duties of Your occupation," and after the occupation period, "unable to Work in any occupation You are reasonably suited to by Your education, training and experience."  Dkt. 30-9 at p. 17.

> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any Gainful Occupation.

*Id.* at p. 22.

The policy's "Schedule of Benefits" for both executives and physicians defines "own occupation period" as a period beginning at the end of a six-month elimination period[7] and ending at the termination of the maximum benefit period. *Id.* at 7-10. The schedule of benefits also provides for a waiting period of "12 months of continuous active work" prior to the beginning of the leave. *Id.*

During his STD leave, Leit requested and received from Aspirus the materials needed to apply for benefits under its LTDI policy, which is insured through Lincoln. On February 19, 2021, Aspirus's Leave Management Services department sent Leit an email stating that Aspirus had determined that Leit was not eligible for LTDI because he had not worked at least 12 months for Aspirus before beginning his leave.

Undeterred, Leit applied for benefits under the LTDI policy after his STD leave period expired on February 23, 2021. Along with the April 12, 2021 application, Leit's physician submitted a statement that Leit was completely disabled and unable to work in any capacity as an orthopedic surgeon. In a letter dated April 22, 2021, Lincoln informed Leit that his August 26, 2020 date of disability occurred prior to the date that Leit's LTDI coverage would have become effective, which Lincoln deemed to be November 1, 2020. *See* dkt. 29-24, at 2-3. The denial letter states that Lincoln evaluated Leit's claim by applying the provisions of the policy

---

[7] The elimination period is "180 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 360 calendar day period." *Id.* at 9.

to the facts and opinions contained in the claim file.  The letter did not state that Lincoln had determined that Leit was disabled within the meaning of the LTDI policy or that it had reviewed medical evidence relevant to Leit's application.  *Id.*  Leit filed an appeal, which Lincoln denied on November 16, 2021, again relying on Leit's non-compliance with the 12-month waiting period.  *See* dkt. 29-25.

## V.  Pre-Termination Discussions and Termination

In the fall of 2020, Leit stated his concerns about his ability to perform the full scope of general orthopedics, so Aspirus offered him a separation agreement at that time.  After receiving that offer, Leit indicated that he wanted to return to Aspirus and continue his employment.  Aspirus continued to check in on Leit.

During an October 15, 2020 call with John Monks (Aspirus's Vice President of Operations) and Dr. Michael Walters (Aspirus's System Senior Physician Executive for Specialty Care), Leit shared his health issues, and the group discussed Leit's desire to return to Aspirus when he was able to return to work.  In a February 3, 2021 conference call with Monks, Walters, and Kim Entenmann (Aspirus's Vice President of Human Resources), Leit stated that he was still sick, he was sleeping 12 to 16 hours a day, he was unable to work, and he was collecting STD benefits through Aspirus, and collecting LTD benefits through his two private policies.

In April 2021, Michael-Leah Reich (Human Resources Business Partner – Specialty, Tertiary), Monks, Walters, Entenmann, Jenny Redman-Schell (President of Aspirus Medical Group), and legal counsel discussed ending Leit's employment because Leit was not cleared to return to work and had completed or exhausted every type of leave available to him through

Aspirus.  On May 5, 2021, Leit received a telephone call from Monks, Walters, and Reich, who informed Leit that Aspirus was terminating his employment that day under § 6.1.3 of the employment contract.  Aspirus memorialized the May 5 termination in a letter dated May 19, 2021, stating that Leit was being terminated pursuant to § 6.1.3 of his employment agreement.


OPINION

Summary judgment is appropriate when there are no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made."  *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).  If a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, then summary judgment must be granted.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).


**I.  Breach of Contract Claim**

Section 8.7 of Leit's employment agreement provides that the agreement is governed by Wisconsin law.  The parties agree that in Wisconsin, a breach of contract claim only exists where there is "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages."  *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11,

289 Wis. 2d 795, 807, 714 N.W.2d 582, 588, *aff'd sub nom.*, 2006 WI 128, ¶ 11, 297 Wis. 2d 606, 724 N.W.2d 879.

The interpretation of a contract is governed by the contract's language, which "is construed according to its plain or ordinary meaning, consistent with what a reasonable person would understand the words to mean under the circumstances." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶¶ 34-37, 363 Wis. 2d 699, 712-13, 866 N.W.2d 679, 685 (internal citation omitted). "When the terms of a contract are clear and unambiguous, we construe the contract's language according to its literal meaning." *Id.* at ¶ 35. But when the terms of a contract are ambiguous because they are "fairly susceptible of more than one construction," evidence extrinsic to the contract may be used to determine the parties' intent and any remaining ambiguities will be construed against the drafter. *Id.* at ¶ 36.

Neither party argues that the termination provision in Leit's employment agreement is ambiguous, but they disagree about its meaning. *See Salewske v. Depies*, 2000 WI App 256, ¶ 18, 239 Wis. 2d 594, 620 N.W.2d 482 ("A term is not ambiguous . . . just because persons may reach different conclusions regarding the meaning or may interpret the term differently."). Therefore, interpretation of this provision is a question of law for the court. *See BV/Bl, LLC v. Investors Bank*, 2010 WI App 152, ¶ 19, 330 Wis. 2d 462, 472, 792 N.W.2d 622, 627-28.

Leit's employment agreement states that it "shall terminate" if any one of five, specific events occurred. Relevant to the parties' dispute is the third event (§ 6.1.3): a determination of being disabled. The contract does not identify who shall make this determination, but it states that the term "disabled, and the procedures for being determined disabled, shall be defined in the disability insurance policy provided by Aspirus hereunder." The contract contains no

further information about the policy in question, but the parties seem to agree that this language, at a minimum, encompasses the LTDI policy provided by Aspirus.[8]

The LTDI policy defines disability as being unable to perform the main duties of your occupation or any gainful occupation after 180 days of disability resulting from the same sickness.  It is undisputed that Aspirus determined Leit to be disabled as that term is defined in the LTDI policy: Leit made numerous representations that he could not perform the main duties of his occupation or any other occupation between August 27, 2020 and May 2021.  He was found to be disabled under Aspirus's STD plan and two private LTD policies with substantially similar definitions of total disability.  And believing that he fit the definition of total disability, Leit applied for benefits offered through Aspirus's LTDI policy.

However, § 6.1.3 of Leit's employment contract also states that "the *procedures* for being determined disabled" shall be defined by the policy (emphasis added).  Leit interprets this phrase to mean that Aspirus's LTDI carrier, Lincoln National Life Insurance Company, is the sole entity authorized to make the disability determination for purposes of termination.  Leit bases this contention on his interpretation of several provisions in the LTDI policy that provide Lincoln with the conclusive and binding authority to manage and interpret the policy and administer claims under it.  *See* dkt. 23, at 11 (citing dkt. 26-2, at pp. 25-28).  These LTDI provisions cited

---

[8] Leit contends that the referenced policy *has* to be the LTDI policy because Aspirus only maintained a STD *plan* and did not provide him with a STD *insurance policy*.  *See* dkt. 23 at 4.  Aspirus does not provide any evidence to the contrary, but it does rely on the fact that it already had determined Leit to be disabled under its STD plan as evidence that Aspirus had complied with the agreement's termination provision.

by Leit all are contained in the "Claims Procedure" section and include "requirements" for providing a notice of claim, completed claim forms, and proof of claim to Lincoln.[9]

From this, Leit contends that Aspirus could not invoke the termination clause in § 6.1.3 because Lincoln denied him LTDI benefits on eligibility grounds—i.e., for stopping active work too soon—and thus never made an affirmative determination that he is disabled. According to Leit, Aspirus breached the employment contract by usurping Lincoln's sole responsibility to determine whether Leit was disabled within the meaning of the LTDI policy. *See Ashker v. Aurora Med. Grp., Inc.*, 2013 WI App 143, ¶ 3, 352 Wis. 2d 193, 197, 841 N.W.2d 297, 299 (finding Aurora breached radiologist's employment agreement because none of seven specific events allowing for immediate termination had occurred).

Leit is incorrect. First, and contrary to Leit's contention, the LTDI policy does not set forth any procedure(s) that must be used–by Lincoln or by anyone else–to determine disability. Leit asserts that these procedures are found in the claims procedure section; not so: they aren't there. This section includes nothing but requirements that Leit would have to follow in order to be considered eligible for benefits. It does not set forth or define how disability will be determined. For example, the fact that Leit may have complied with all of these claims procedure requirements does not mean that he is disabled as that term is defined under the policy.

Next, the phrase "the procedures for being determined disabled" does not have–cannot have–the meaning that Leit ascribes to it. Under Leit's gloss, any time that Aspirus seeks to

---

[9] Specifically, within 45 days of receiving proof of claim, Lincoln is required to send the employee a written notice of its claim decision. *Id.* at 26. If coverage is denied, then the employee has the right to request a claim review by Lincoln. *Id.*

terminate an employee under § 6.1.3 of his/her employment agreement, Aspirus is required first to obtain from Lincoln a determination that the employee is eligible to receive LTDI benefits under Lincoln's policy, even when–as in Leit's case–the employee is indisputably unable to perform the main duties of his/her occupation or any other gainful occupation, and even when–as in Leit's case–the employee is not actually eligible to receive LTDI benefits for procedural reasons. This borders on the absurd. In any event, and finally, Leit's employment agreement does not state in plain and uncertain terms that Lincoln, and not Aspirus, was solely responsible for determining whether Leit was disabled, or that Leit must receive benefits under a disability insurance policy before Aspirus may terminate him under § 6.1.3.

In short, Aspirus complied with the express terms of the employment agreement when it terminated Leit based on his repeated averments of his inability to work in any capacity due to his disability.

## II. Breach of Implied Covenant

In Wisconsin, every contract implies good faith and fair dealing and a duty of cooperation on the part of both parties. *Beidel v. Sideline Software, Inc*., 2013 WI 56, ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240 (quoting *Chayka v. Santini*, 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561 (1970)). But "a party cannot violate the duty of good faith and fair dealing by taking an act that is specifically authorized by the parties' agreement." *August Res. Funding, Inc. v. Procorp, LLC*, 482 F. Supp. 3d 808, 814 (W.D. Wis. 2020); *see also Beidel*, 348 Wis. 2d 360, ¶ 29 ("A party may not . . . employ the good faith and fair dealing covenant to undo express terms of an agreement.").

Because I have concluded that Aspirus is entitled to summary judgment with respect to Leit's claim that it breached the express terms of the employment contract's termination provision, it is not necessary to consider Leit's related claim that Aspirus breached its duty of good faith and fair dealing by failing to abide by the termination provision. *Ashker v. Aurora Med. Grp., Inc.*, 2013 WI App 143, ¶ 10, 352 Wis. 2d 193, 200, 841 N.W.2d 297, 300 (holding same). Aspirus is entitled to summary judgment on Leit's good-faith claim because it was entitled to terminate Leit under the disability provision. *See* Pltf's Resp. Br., dkt. 32 at 5-6 (agreeing summary judgment appropriate for Aspirus under these circumstances).

ORDER

IT IS ORDERED that:

    (1)  Plaintiff Michael Leit's motion for partial summary judgment, dkt. 22, is DENIED, and

    (2)  Defendant Aspirus Medical Group, Inc.'s motion for summary judgment, dkt. 27, is GRANTED.

The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 10th day of April, 2023.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

14